IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

FREDERICK D. WRIGHT                                            PLAINTIFF

VS.                              CASE NO. 04-CV-1116

PILGRIM'S PRIDE CORPORATION                                   DEFENDANT

## MEMORANDUM OPINION

Before the Court is a Motion for Summary Judgment filed on behalf of the Defendant

Pilgrim's Pride Corporation.  (Doc. No. 43).  The Plaintiff has responded to the motion.  (Doc.

No. 48).  The Defendant filed a reply to Plaintiff's response.  (Doc. No. 54).  The matter is ripe

for consideration.

## BACKGROUND

In 1994, Frederick Wright, an African-American, was hired at the Defendant's chicken

processing plant in El Dorado, Arkansas.  He began work in the Pre-pack Maintenance

Department.  In 2000, Wright bid on and was awarded a job in the Refrigeration Department.

The Refrigeration Department is responsible for cooling the plant to ensure that the processed

chicken is stored at proper temperatures.  To accomplish this, the department runs 24 hours a

day, seven days a week.  It is staffed by two employees on three different shifts—the day shift, that

runs from 7:00 a.m. to 3:00 p.m., the evening shift that runs from 3:00 p.m. to 11:00 p.m., and

the night or graveyard shift, that runs from 11:00 p.m. to 7:00 a.m.

When Wright first transferred to the Refrigeration Department, he worked the evening

shift with Lester Guice, a Caucasian.  Other employees within the department were: Reginald

Caver, an African-American; Russell Hendricks, a Caucasian; Randy Banks, a Caucasian; and Jerry Watkins, a Caucasian.  Reginald Caver and Russell Hendricks worked the day shift.  Randy Banks and Jerry Watkins worked the night or graveyard shift.  Soon after Wright transferred into the department, Russell Hendricks was promoted to Refrigeration Department Manager.  As department manager, Hendricks continued to work the day shift with Reginald Caver.  During this time, Caver served as a Union steward.

In 2001, Wright transferred to a different department for approximately one month.  When he returned to the Refrigeration Department, Wright began working the night or graveyard shift with Caucasian co-worker Randy Banks.  During this shift, Wright and Banks worked unsupervised because Hendricks, the department manager, did not work this shift except for a few minutes in the morning when he briefly discussed the shift's activities with Wright and Banks.

From December 2002 through September 2004, Wright filed 40 Union grievances that related to overtime work.  In all but four of these grievances, Wright alleged that Hendricks should have offered overtime work to him instead of his African-American co-worker Reginald Caver.  In the other four grievances, Wright alleged that his Caucasian co-workers Lester Guice and Randy Banks were offered overtime instead of him.[1]   In none of these grievances did Wright complain of race discrimination or retaliation.

In July 2003, Wright received a settlement payment from the Defendant for the overtime he claimed that Lester Guice received instead of  him.  In June 2006, Wright received another

---

[1]  In January 2003, Wright alleged that Hendricks offered Guice overtime on three separate occasions and in July 2004, he alleged that Banks was offered overtime on one occasion.

2

settlement payment from the Defendant for all the overtime he claimed that he was owed.

On October 7, 2003, Wright requested vacation time from November 21, 2003 through November 29, 2003, in order to attend a football game in New Orleans.  When he submitted the vacation request form to Russell Hendricks, Hendricks informed Wright that Reginald Caver was already taking vacation during that week.  Hendricks did not approve Wright's vacation request until September 24, 2003, approximately two weeks later.  Wright claims that this delay created a hardship on him because all the decent motel rooms in New Orleans were taken.  None of Wright's vacation requests have ever been denied by Hendricks.  This is the only one where approval was delayed.  In November 2003, Hendricks allowed Randy Banks, Wright's Caucasian co-worker, to leave work early to attend a different football game.

In late 2003, Hendricks told Wright to unclog a drain at the bottom of a pit full of water that contained raw and rotten meat.  Wright claims that Randy Banks should have been assigned the task because Banks was the less senior man.  Since this was a one time event, Wright did not file a grievance regarding the job assignment and did not ask Reginald Caver, in his capacity of Union steward, to do anything about it.  Caucasian employees are now responsible for keeping this drain clean.

On February 10, 2004, Wright filed a charge with the Equal Employment Opportunity Commission ("EEOC").  In this charge, Wright claimed that he had been discriminated against on the bases of his race and retaliation.  He claimed that he was denied overtime, his vacation request was delayed and his white co-workers were given easier jobs.

A week later, Wright and Tim Taylor, the Maintenance Supervisor, got into a verbal dispute.  After this altercation, Taylor directed Russell Hendricks to "make Fred pay."

3

Thereafter, Wright was assigned the job of painting gas lines on the roof of the building.  He did this job for three days.  During these three days, Wright went to Reginald Caver and complained about the job assignment.  In response to his complaints, Caver, as Union steward,  went to Hendricks and told him he needed to assign jobs to the shift in general rather than assigning a specific job to a particular worker.  After this, the job of painting the pipes on the roof was assigned to the night shift in general rather than to Wright in particular.  During this time, someone wrote in the logbook "crybaby, you're getting paid!" out beside where Wright had written that he painted the gas lines yellow in 32°weather and in the dark.  A picture of a face crying was also drawn in the logbook around this time.

On March 31, 2004, Wright was deposed in the discrimination lawsuit, *Atkins v. Conagra.*  Teddy Golmon, a Pre-pack Maintenance Supervisor who was also deposed, knew that Wright had been subpoenaed to testify.  Shortly thereafter, on the night of April 8, 2004, Teddy Golmon, Randy Banks and Billy Willis, all Caucasians, witnessed Wright sleeping on the job. Wright was suspended, even though he denied that he was sleeping.  He was told to call back on April 12, 2004, to inquire about his job status.  When Wright called back on April 12th, he was informed that his employment was being terminated.  Neither Golmon nor Hendricks made the decision to terminate Wright's employment.  Tim Taylor, as Maintenance Supervisor, made that decision.

Thereafter, Wright called the Defendant's corporate offices about his concerns with his termination.  After reviewing the circumstances of Wright's termination, the corporate Human Resources Director changed Wright's termination to a suspension and returned him to work under a Return to Work Agreement.  Under this agreement, Wright agreed to return to work on

4

six-months probation during which time he could be immediately terminated for any work-rule violation. At some point after his return to work, panties were hung on Wright's locker, along with the lockers of other refrigeration employees. Wright refused to remove the panties from his locker in order to see if management would remove the underwear on its own.

On May 26, 2004, Wright amended his February EEOC charge. In his amended charge, in addition to his previous charges, Wright added that he was terminated on April 8, 2004, for allegedly sleeping on the job. He stated that his termination was later changed to a three day suspension. In his amended charge, Wright did not mention his deposition in the *Atkins* case in connection with his April termination/suspension.

On July 6, 2004, at about 1:30 a.m, a fuse blew in a compressor controller in the Refrigeration Department. Neither Wright nor Randy Banks, who were working the night shift, discovered the blown fuse. It was eventually discovered by Russell Hendricks and Reginald Caver at the start of the day shift after both Wright and Banks had gone home. As a result of this blown fuse, the plant overheated and production was shut down for several hours while the plant cooled down to the correct temperature. When Banks and Wright came to work the next night, they learned of the plant shut down. Banks admitted that neither he nor Wright made the required equipment check during the previous night. Wright claims that it was Banks' responsibility to make the check. Hendricks and Caver determined that both Banks and Wright were at fault–by not making the required equipment check and by not monitoring the system. Both Banks and Wright received written warnings because of the incident. Because Wright was on probation, his written warning resulted in his termination. This termination was later changed to a suspension. On July 15, 2004, Wright filed a Union grievance regarding his treatment verus

the treatment of Randy Banks in connection with this incident.

On August 20, 2004, Wright received a letter from the EEOC stating that the evidence before it did not substantiate the allegations in his EEOC charge. Wright was given ten (10) days in which to furnish the EEOC with additional evidence in support of his claims. Wright did not provide the commission with any additional evidence. Thereafter, on August 31, 2004, the EEOC issued Wright a right to sue letter.

In September 2004, Reginald Caver told Randy Banks that he and Russell Hendricks were going to assign Wright the job of draining the oil from the refrigeration system. Several days later, Wright attended a grievance meeting with the Union and Michael Gooch, the complex HR manager. Thereafter, Wright was given the job of draining the oil from the refrigeration system. The job required Wright to turn approximately 13 values so the oil could drain from the system. Wright claims that he should not have been assigned this job alone. He threatened to report Hendricks to Michael Gooch about being assigned this task. In response to his complaint, Hendricks assigned Lester Guice, and then Dorian Thompson, to help Wright with this job.

Wright claims that during one of his suspensions, someone put a small dent in his toolbox. He also claims that someone changed the word "shirts" to "skirts" on a dry-erase board when he requested new work shirts. Again, Wright refused to remove the allegedly offensive word "skirts" to see if management would remove it on its own.

On November 22, 2004, Wright filed this action against Pilgrim's Pride. On June 1, 2007, Wright amended his Complaint. In his amended Complaint, Wright alleges racial discrimination, racial harassment and retaliation arising out of his employment with Pilgrim's Pride. He claims that Pilgrim's discriminated against him in violation of 42 U.S.C. §2000e, *et*

6

*seq.,* Title VII of Equal Employment Opportunity Act (EEOA) (as amended by the Civil Rights

Act of 1991), the Arkansas Civil Rights Act of 1993(A.C.A. §16-123-101, *et seq.*)(ACRA) and 42

U.S.C. §1981.  The matter is now before the Court on the Defendant's  Motion for Summary

Judgment.

<u>STANDARD OF REVIEW</u>

The standard of review for summary judgment is well established.  The Federal Rules of

Civil Procedure provide that when a party moves for summary judgment;

> The judgment sought shall be rendered forthwith if the pleadings, dispositions,
> answers to interrogatories, and admissions on file, together with affidavits, if any,
> show that there is no genuine issue as to any material fact and that the moving party
> is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c); *Krenik v. County of LeSueur,* 47 F.3d 953 (8th Cir. 1995).  The Supreme Court

has issued the following guidelines for trial courts to determine whether this standard has been

satisfied:

> The inquiry performed is the threshold inquiry of determining whether there is a
> need for trial–whether, in other words, there are genuine factual issues that properly
> can be resolved only by a finder of fact because they may reasonably be resolved
> in favor of either party.

*Anderson v. Liberty Lobby, Inc.,* 447 U.S. 242, 250 (1986).  *See also Agristor Leasing v. Farrow,*

826 F.2d 732 (8th Cir. 1987); *Niagara of Wisconsin Paper Corp. v. Paper Indus. Union-*

*Management Pension Fund,* 800 F.2d 742, 746 (8th Cir. 1986).  A fact is material only when its

resolution affects the outcome of the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248.  A

dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict

for either party. *Id.* at 252.

The Court must view the evidence and the inferences that may be reasonably drawn from

the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* The nonmoving party must then demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of LeSueur,* 47 F.3d at 957. A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 256.

The Eighth Circuit has observed that "summary judgment should seldom be granted in the context of employment actions, as such actions are inherently fact based." *Hindman v. Transkrit Corp.,* 145 F.3d 986, 990 (8th Cir. 1998). However, it has also noted "there is no 'discrimination case exception' to the application of Fed.R.Civ.P. 56, and it remains a useful tool to determine whether or not any case, including one alleging discrimination, merits a trial." *Pope v. ESA Services, Inc.,* 406 F.3d 1001, 1006 (8th Cir. 2005)(quoting *Berg v. Norand Corp.,* 169 F.3d 1140, 1144 (8th Cir. 1999)); *see also, Wallace v. DTG Operations, Inc.,* 442 F.3d 1112, 1118 (8th Cir. 2006)(no separate summary judgment standard exists for discrimination or retaliation cases).

<u>DISCUSSION</u>

In this case, Plaintiff Frederick Wright claims that he was subjected to discrimination due to his race, that he was retaliated against for engaging in protected conduct, and that he was subjected to a hostile work environment based on retaliation. He claims that this discrimination was in violation of 42 U.S.C. §2000e, *et seq.,* Title VII of Equal Employment Opportunity Act (EEOA) (as amended by the Civil Rights Act of 1991), the Arkansas Civil Rights Act of

1993(A.C.A. §16-123-101, *et seq.*)(ACRA) and 42 U.S.C. §1981.

In evaluating these type of claims, the Court uses the familiar three-step burden shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)(applied to Title VII claim). *See also Turner v. Honeywell Federal Mfg. & Techs., LLC.* 336 F.3d 716 (8th Cir. 2003)(analysis applied to § 1981 claims); *Flentje v. First Nat. Bank of Wynne,* 340 Ark. 563, 11 S.W.3d 531 (2000)(analysis applied to Arkansas Civil Rights Act claims). Under the *McDonnell Douglas* framework, a presumption of discrimination is created when the plaintiff meets his burden of establishing a prima facie case of discrimination. If the plaintiff is able to do this, the burden of production then shifts to the defendant to assert a legitimate nondiscriminatory reason for the alleged discrimination. If the defendant sets forth such a reason, the burden then shifts back to the plaintiff to establish that the asserted reason was merely a pretext for discrimination. The Court will review each of Wright's claims in light of the above burden shifting framework.

**Racial Discrimination Claims**

Title VII prohibits an employer from discriminating "against any individual with respect to [his] compensation, terms, conditions, or privileges of employment, because of such individual's race ..." 42 U.S.C. 2000e-2(a)(1).

In this case, Wright claims that the Defendant discriminated against him on the basis of his race by denying him overtime work, by assigning his Caucasian co-workers easier jobs, by delaying approval of his vacation request and by terminating him in April 2004. In order to establish a prima facie case of racial discrimination, Wright must show that 1) he is a member of a protected class; 2) he was meeting his employer's legitimate job expectations; 3) he suffered an

adverse employment action; and 4) similarly situated employees outside the protected class were treated differently. *Carpenter v. Con-Way Central Express, Inc.,* 481 F.3d 611, 616 (8th Cir. 2007)(citing *Shanklin v. Fitzgerald,* 397 F.3d 596, 602 (8th Cir. 2005), *cert denied,* 546 U.S. 1066 (2005).

### Denial of overtime work

Wright claims that the Defendant discriminated against him by denying him overtime work. Wright has shown that he is a member of a protected class–African-American–who was meeting his employer's legitimate job expectations and who was denied overtime work by the Defendant on some 40 separate occasions. Thus, there is no doubt that he can establish the first three elements of his prima facie case. However, the Defendant contends that Wright can not show that similarly situated employees outside his protected class were treated differently, or if he can, that Defendant's legitimate nondiscrimination reason for denying him overtime was a pretext for discrimination.

The evidence shows that from December 2002 through September 2004 Wright filed approximately 40 Union grievance regarding overtime work which he believed should have been offered to him. In all but four of these grievances, Wright claims that Reginald Caver, an African-American, was offered  overtime work that should have been offered to him. Since Caver is African-American, Wright can not establish the fourth element of his prima facie case–that a similarly situated employee outside the protected class was treated differently. Thus, he can not make out a prima facie case of racial discrimination for those occasions when Reginald Caver was offered overtime work instead of him.

In four of his Union grievances, Wright claims that his Caucasian co-workers Lester Guice

and Randy Banks were offered overtime work instead of him.[2]  Since Guice and Banks are outside the protected class and were treated differently than him, Wright has established his prima facie case of discrimination for those occasions when Guice and Banks were offered overtime work instead of him.

In response to this inference of discrimination, the Defendant asserts that the reason Wright was not offered this overtime work was not because of his race but because he was not the most qualified employee under the CBA.[3]  It contends that Guice and Banks were either the regularly assigned employee(s) to the shift or had more departmental seniority than Wright. Therefore, it argues that the overtime work was appropriately offered to these employees.   In response, Wright has not provided any evidence to rebut the Defendant's legitimate nondiscriminatory reason or shown that race was the true motivation behind the awarding of overtime to Guice and/or Banks.

Wright has not established his prima facie case of discrimination in regard to the overtime received by Caver or shown that the Defendant's legitimate nondiscriminatory reason for awarding the overtime to Guice and Banks was a pretext for discrimination.  Thus, Wright has not carried his burden in showing that he was discriminated against on the basis of his race in regard to the awarding of overtime work.  Accordingly, the Court finds that this claim must fail as a matter of law.

---

[2] In January 2003, Wright claims that on three occasions Lester Guice was offered overtime work that should have been offered to him.  In July 2004, he claims that on one occasion Randy Banks was offered overtime instead of him.

[3]  The CBA states that overtime work shall be offered: First, to the regularly assigned employee(s); Second, to the senior qualified employee(s) in the department; and Third, to the most junior qualified employee(s).

11

*Job assignments*

Wright claims that the Defendant discriminated against him by assigning him certain jobs. He claims that he was given the job of unclogging a drain at the bottom of a pit full of dirty water, of building a guard rail out of scrape metal, of painting the gas lines on the roof of the building and of draining oil from the refrigeration system.  He claims that these jobs should have been given to his Caucasian co-workers instead of him.

Wright has shown that he is a member of a protected class–African-American–who was meeting his employer's legitimate job expectations.  Thus, there is no doubt that he can establish the first two elements of his prima facie case.  However, the Defendant contends that these job assignments are not adverse employment actions.  Therefore, it argues that Wright can not establish the third element of his prima facie case of discrimination.

"[An] adverse employment action must be one that produces a material employment disadvantage."  *Higgins v. Gonzales,* 481 F.3d 578, 584 (8th Cir. 2007)(quoting *Kerns v. Capital Graphics, Inc.,* 178 F.3d 1011, 1016-17 (8th Cir. 1999)).  Therefore, to be actionable, an employment action must be one that causes a material change in the terms or conditions of employment. *Tipler v. Douglas County, Nebraska,* 2006 WL 1314328 (D.Neb. 2006) (citing *Ledergerber v. Stangler,* 122 F.3d 1142, 1144 (8th Cir. 1997)).  Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage do not meet the standard of an adverse employment action.  *Kerns,* 178 F.3d  at 1016-17.

In this case, there is no evidence that the above job assignments caused a material change in the terms or conditions of Wright's employment.  In fact, the evidence shows that three of the

12

four job assignments occurred only once and that other employees, both African-American and

Caucasian, have performed these same or similar jobs.  The evidence also shows that the job of

draining oil, although reoccurring, is one that is also performed by Wright's Caucasian co-worker

Lester Guice.  Although Wright found these job assignments to be unpalatable and/or unwelcome,

they did not produce a material employment disadvantage.  Wright has not established the third

element of his prima facie case of discrimination–that he suffered an adverse employment action.

Thus, he can not make out a prima facie case of racial discrimination in regard to the above job

assignments.  Accordingly, the Court finds that this claim must fail as a matter of law.

*Delay in vacation approval*

Wright claims that the Defendant discriminated against him when it delayed in approving

his vacation request.  Wright has shown that he is a member of a protected class–African-

American–who was meeting his employer's legitimate job expectations.  He has also shown that

Randy Banks, a Caucasian co-worker, was allowed to leave early to attend a football game.  Thus,

the Court is going to assume that Wright can establish the first, second and fourth elements of his

prima facie case.  However, there is no evidence that this delay in approving his vacation request

was an adverse employment action.  It did not cause a material change in the terms or conditions

of Wright's employment.  Wright has not established the third element of his prima facie case of

discrimination–that he suffered an adverse employment action.   Thus, he can not make out a

prima facie case of racial discrimination in regard to this delay.  Accordingly,  the Court finds that

this claim must fail as a matter of law.

*Termination/suspension in April 2004*

Wright claims that the Defendant discriminated against him by terminating/suspending

13

him in April 2004.  Wright has shown that he is a member of a protected class–African-American–who was meeting his employer's legitimate job expectations and who was terminated/suspended for allegedly sleeping on the job.  There is no doubt that Wright can establish the first three elements of his prima facie case.  However, Wright has not produced any evidence showing that  similarly situated Caucasian employees were treated differently than him when they were caught sleeping on the job.  In fact, the evidence before the Court shows that Bradley Camp, a Caucasian maintenance worker, was terminated for sleeping on the job.  Wright has not established the fourth element of his prima facie case of discrimination–that similarly situated employees not in the protected class were treated differently than him.  Thus, he can not make out a prima facie case of racial discrimination in regard to his termination/suspension in April 2004.  Accordingly, the Court finds that this claim must fail as a matter of law.

**Retaliation Claims**

Title VII prohibits retaliation against an employee who filed charges of discrimination or assisted others in opposing discrimination.  42 U.S.C. § 2000e-3(a); *Thompson v. Bi-State Dev. Agency,* 463 F.3d 821 (8th Cir. 2006). The "scope of this anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Burlington Northern & Santa Fe Ry. Co. v. White,* __ U.S. __, 126 S.Ct. 2405, 2414, 165 L.Ed.2d 345 (2006).   Its purpose is not to protect an individual from all retaliation, but "from retaliation that produces injury or harm." *Id.*

As in a Title VII discrimination claim, in a retaliation claim the plaintiff bears the burden of establishing a prima facie case.  Therefore, in order to establish such a claim, a plaintiff must show that: 1) he engaged in protected conduct; 2) a reasonable employee would have found the

14

challenged retaliatory action materially adverse; and 3) the materially adverse action was causally linked to the protected conduct. *Burlington Northern*, 126 S.Ct. at 2415; *Higgins,* 481 F.3d at 589. A retaliatory action is materially adverse if "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Higgins,* 481 F.3d at 589 (quoting *Burlington Northern,* 126 S.Ct. at 2415). The standard is thus objective, requiring the court to consider whether a reasonable employee in the plaintiff's position might have been dissuaded from making a discrimination claim because of the employer's retaliatory actions. *Id.* (citing *Burlington Northern,* 126 S.Ct. at 2412-2413). The Supreme Court in *Burlington Northern* emphasized that the adverse action must be "material" because "it is important to separate significant from trivial harms. *Burlington Northern,* 126 S.Ct. at 2415. "[P]etty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id.* "Title VII ... does not set forth 'a general civility code for the American workplace.' " *Id.* (quoting *Oncale v. Sundowner Offshore Serv., Inc.,* 523 U.S. 75, 80 (1998)). Therefore, the standard set forth in *Burlington Northern* asks the Court to consider what a reasonable employee would do in Frederick Wright's shoes.

In this case, Wright claims that the Defendant retaliated against him for his protected activities of filing Union grievances, filing EEOC charges and giving his deposition in the *Atkins v. Conagra* lawsuit. He claims that he was retaliated against when 1) approval of his vacation request was delayed, 2) other employees were given overtime work instead of him, 3) he was assigned  jobs that should have gone to other employees, and 4) he was terminated (that was changed to a suspension) in April 2004 and July 2004. The Court will address each alleged retaliatory action separately.

*Approval of Wright's vacation request was delayed two weeks*

Wright claims that in October 2003 approval of his vacation request was delayed in retaliation of his filing Union grievances. Wright filed some 19 Union grievances before October 2003.[4] There is no doubt that he engaged in protected conduct, thus, establishing the first element of his prima facie case. However, the Defendant argues that he can not establish the second element of his prima facie case–that the challenged retaliatory conduct was materially adverse.

As stated above, a retaliatory action is materially adverse if it would dissuade a reasonable employee from making or supporting a complaint of discrimination or harassment. The Court does not believe that a two week delay in approving one's vacation request would dissuade a reasonable employee standing in Wright's shoes from complaining of discrimination. Rather, such a delay is a trivial harm or a minor annoyance that often takes place at work. The Court finds that the challenged retaliatory conduct is not materially adverse. Thus, he has failed to establish the second element of his prima facie case. Wright can not make out a prima facie case of retaliation in regard to his delayed vacation request. Accordingly, the Court finds that this claim of retaliation must fail as a matter of law.

*Overtime work was given to other employees instead of Wright*

Wright claims that other employees were given overtime work instead of him in retaliation of his filing Union grievances. Wright filed some 40 Union grievances from December 2002 through September 2004 and he was denied overtime work during the time he was filing these

---

[4] Wright filed 10 Union grievances in December 2002. He filed 9 Union grievances from January 2003 through June 2003.

grievance.  Therefore, the Court will assume that Wright can make out a prima facie case of retaliation in connection with this claim.

In response to this inference of retaliation, the Defendant contends that it has a  legitimate nondiscriminatory reason for offering the overtime work to these other employees instead of Wright.  Specifically, it states that Reginald Caver, Lester Guice and Randy Banks all were more qualified than Wright under the CBA's qualifications for receiving overtime work.  It claims that all three employees either had more departmental seniority than Wright or they were the regularly assigned employees to the shift.  Therefore, the Defendant argues that the overtime work was appropriately offered to these employees.  In response, Wright has not presented any evidence showing that the Defendant's legitimate nondiscriminatory reason for awarding the overtime work to Caver, Guice and/or Banks was merely a pretext for retaliation.  Therefore, the Court finds that this claim of retaliation must fail as a matter of law.

### *Jobs were given to Wright that should have been given to other employees*

Wright claims that certain jobs were assigned to him instead of other employees in retaliation of his filing Union grievances and his EEOC charges.  First, Wright claims that he was assigned the job of unclogging a drain at the bottom of a pit of dirty water in late 2003 in retaliation of filing Union grievances.  Wright filed some 27 Union grievances from December 2002 through December 2003.[5]  There is no doubt that he engaged in protected conduct, thus, establishing the first element of his prima facie case.  However, the Defendant argues that Wright can not establish the second element of his prima facie case–that the challenged conduct was

---

[5] Wright file 10 Union grievances in December 2002.  He filed 17 Union grievances from January 2003 through December 2003.

materially adverse.

The Court believe that this one time job assignment is not the kind of action that would dissuade a reasonable employee standing in Wright's shoes from bringing a complaint of discrimination or harassment. Although unclogging this drain was admittedly a dirty messy job, it was a trivial harm that happened only one time. Wright has never been assigned this job again. In fact, the evidence shows that employees other than Wright are now responsible for keeping this drain clean. The Court finds the challenged retaliatory conduct is not an action that a reasonable employee would consider materially adverse. Thus, he has failed to establish the second element of his prima facie case. Wright can not make out a prima facie case of retaliation in regard to this job assignment.

Wright also claims that he was assigned the job of painting gas lines on the roof of the building in retaliation of his filing an EEOC charge. He also claims that he was assigned this job because Tim Taylor told Russell Hendricks to "make Fred pay."[6]  In February 2004, Wright filed a charge with the EEOC. There is no doubt that Wright engaged in protected conduct when he filed this charge. Thus, he has established the first element of his prima facie case of retaliation. However, the Defendant argues that he can not establish the second element of his prima facie case–that the challenged retaliatory conduct was materially adverse.

Again, the Court believes that this one time job assignment is not the kind of action that would dissuade a reasonable employee standing in Wright's shoes from bringing a complaint of discrimination or harassment. In fact, it did not dissuade Wright from complaining to Reginald

---

[6] Tim Taylor made this statement after he had a verbal dispute with Wright over certain job assignments and when these assignments would be done.

18

Caver, the Union steward.  After he  complained to Caver, the job of painting the gas lines on the

roof of the building was no longer specifically assigned to him.  Rather, it was assigned to the

night shift in general.  The Court finds that this challenged retaliatory conduct is not an action that

a reasonable employee would consider materially adverse.  Thus, he has failed to establish the

second element of his prima facie case.  Wright can not make out his prima facie case of

retaliation in regard to this job assignment.[7]

Wright also claims that he was assigned the job of draining oil from the refrigeration

system in retaliation of his filing Union grievances and attending a grievance meeting in

September 2004.  There is no doubt that filing Union grievances and attending a grievance

meeting are protected activities.  Therefore, Wright has established the first element of his prima

facie case of retaliation.  However, the Defendant argues that he can not satisfy the second

element of his prima facie case–that the challenged retaliatory conduct was materially adverse.

The challenged retaliatory conduct in this case is a job reassignment.  However, it is not

one that involves an arduous or dirty job.  Therefore, the Court does not believe that it is one that

a reasonable employee would consider materially adverse.  It is not the kind of action that would

dissuade a reasonable employee standing in Wright's shoes from bringing a complaint of

discrimination.  In fact, it did not dissuade Wright from threatening to go to Michael Gooch, the

complex HR manager, about the job assignment.  Since then, either Lester Guice or Dorian

Thompson have helped Wright perform this job.  The Court finds this alleged retaliatory conduct

is not materially adverse.  Wright has failed to establish the second element of his prima facie

---

[7]  Because Wright has not made out a prima facie case of retaliation, any evidence
presented by Wright to show pretext such as Tim Taylor's statement to "make Fred pay"
was not be considered by the Court.

case.  Thus, he can not make out a prima facie case of retaliation in regard to this job reassignment.

Wright has failed to set forth a prima facie case of retaliation in regards to the above job assignments and/or reassignment.  Accordingly the Court finds that these claims of retaliation must fail as a matter of law.

### *Wright's Termination/Suspension in April 2004*

Wright claims that in April 2004, he was terminated (that was later changed to a suspension) in retaliation of his testifying in a discrimination lawsuit.  In March 2004, Wright gave his deposition in *Atkins v. Conagra,* a discrimination lawsuit.  Two weeks later, he was terminated.  This termination was later changed to a suspension by the Defendant's corporate office.  Therefore, the Court will assume that Wright can make out a prima facie case of retaliation in connection with this claim.

In response to this inference of retaliation, the Defendant contends that it has a legitimate nondiscriminatory reason for terminating/suspending Wright on April 12, 2004.  It states that on the night of April 8, 2004, Wright was seen sleeping on the job which is a violation of company rules and a terminable offense.   Therefore, the Defendant argues that Wright's termination/ suspension was appropriate and not in retaliation of his testifying in the *Atkins* case.

Wright has not presented any evidence to rebut the Defendant's legitimate nondiscriminatory reason or shown that retaliation was the true motivation behind Wright's termination/suspension.  In fact, the evidence shows that other employees who testified in the *Atkins* case never experienced any type of adverse employment action like a termination or suspension after they testified in the case.  Therefore, Wright has not carried his burden in

showing that he was retaliated against in regard to his termination/suspension in April 2004.
Accordingly, the Court finds that this claim must fail as a matter of law.

*Wright's Termination/Suspension in July 2004*

Wright claims that in July 2004, he was terminated (that was later changed to a
suspension) in retaliation of his filing his amended EEOC charge.  On May 26, 2004, Wright
amended his EEOC charge to include claims regarding his April termination/suspension.
Approximately four weeks later, he was terminated.  This termination was later changed to a
suspension.  Therefore, the Court will assume that Wright can make out a prima facie case of
retaliation in connection with this claim.

In response to this inference of retaliation, the Defendant contends that it has a legitimate
nondiscriminatory reason for terminating/suspending Wright on April 12, 2004.  It states that on
the night of July 6, 2004, neither Wright nor Randy Banks discovered a blown fuse in a
compressor controller.  As a result, the plant overheated and production was shut down for several
hours.  Both employees received a written warning for neglecting their assigned duties.  Since
Wright was on probation, his written warning resulted in his termination/suspension.[8]   Therefore,
the Defendant contends that Wright's termination/suspension was appropriate and not in
retaliation of his amending his EEOC charge in May 2004.

In response, Wright claims the fact that he was terminated and Randy Banks was only
reprimanded shows that the asserted nondiscriminatory reason asserted by the Defendant was
merely a pretext for discrimination.  However, the Court does not find Wright's argument

---

[8] Wright returned to work in April 2004 under a Return to Work Agreement.  Under this
agreement, Wright returned to work on six months probation during which time he could
be immediately terminated for any work-rule violation.

convincing.  The evidence shows that both employees received written warning for neglecting

their assigned duties.  The fact that Wright was terminated/suspended was the result of his

receiving a written warning while on probation, not because Wright and Banks were disciplined

differently.  Wright has not presented sufficient evidence to rebut the Defendant's legitimate

nondiscriminatory reason or shown that retaliation was the true motivation behind Wright's

termination/suspension.  Therefore, Wright has not carried his burden in showing that he was

retaliated against in regard to his termination/suspension in July 2004.  Accordingly, the Court

finds that this claim must fail as a matter of law.

### Claim of a Hostile Work Environment based on Retaliation

Wright claims that he was subjected to a hostile work environment in retaliation of his

filing Union grievances, his filing EEOC charges and his testifying in a discrimination lawsuit.

He claims that he was subjected to unwelcome harassment in the form of comments and drawings

in the logbook,  the corner of his toolbox being bent, panties hung on his locker, and someone

changing the word "shirts" to the word "skirts" by his name on a dry-erase board.

Retaliation claims under Title VII can be based on a hostile work environment.

*Burlington Northern,* 126 S.Ct. at 2414.  As such, the court does not consider whether these

discrete adverse employment actions affect the terms or conditions of employment but rather,

whether they are materially adverse and would dissuade a reasonable worker from making or

supporting a charge of discrimination.  *Id.* at 2415.

Here, there is no doubt that Wright engaged in protected activity when he filed his 40

Union grievances, his two EEOC charges and gave his deposition in the *Atkins* case.  However,

the actions of which Wright complains are simply petty slights and minor annoyances that often

22

take place at work.  They are not significant harms that would dissuade a reasonable employee from complaining of discrimination or harassment.  In fact, the evidence shows that this alleged harassment did not dissuade Wright from making numerous discrimination charges.  Thus, the Court finds that the alleged retaliatory harassment to which Wright was subjected was not materially adverse.  Therefore, Wright can not make out a prima facie case of a hostile work environment based on retaliation.  Accordingly, the Court finds that this claim must fail as a matter of law.

## <u>CONCLUSION</u>

For the reasons discussed herein above, the Court finds that Defendant's Motion for Summary Judgment should be and hereby is **granted.**  A judgment of even date, consistent with this Opinion, will be issued.

IT IS SO ORDERED, this 22nd day of October, 2007.


    /s/Harry F. Barnes
Hon. Harry F. Barnes
United States District Judge